United States v. Swenson. Ms. Wilson, you're not used to going first, but may it please the court. The district court erred in dismissing the indictment with prejudice four days before trial. The requisite prongs of Brady and Giglio weren't satisfied. The court also abused its power by not only imposing a sanction that's reserved for extraordinary situations, but by failing to consider the various elements and by failing to impose the least severe sanction. At most, this case is about an intentional discovery violation. The late disclosure of which were disclosed in plenty of time for trial. For a Brady violation to occur, three factors have to be present. First, the evidence has to be favorable. Here, Swenson's Montgomery County police report regarding birth mother Parker's fraud doesn't qualify as favorable or exculpatory. What happened in that report was Swenson was reporting that Parker was reporting to a completely different scheme, a completely different fraud, not the double matching that was charged here. The police reports related to the non-testifying individuals were irrelevant. Again, unrelated frauds were reported. In relation to the two testifying excuse me, testifying individuals, their statements were either consistent with the 302s that were presented or any inconsistencies were immaterial. None of them negates Swenson's intent in this case here in relation to the wire and mail fraud counts charged here. Also, none of them is favorable to her. This particular Brady prong highlights why a trial is necessary to even evaluate whether evidence is favorable. But when it's evaluated pretrial, that really can't be done. We can look at a document here, we can look at a document here and say this is inconsistent, this is inconsistent, or what have you. But Brady, that's not the examination of Brady. We have to hear what these particular witnesses say in relation to the other evidence of the case. Also, as this Court knows, most Brady cases involve disclosures during trial or even afterwards. And Swenson here also can't satisfy the other two Brady prongs. First, the government must have suppressed evidence. The case law is clear, however, that once evidence is disclosed, it's no longer suppressed, even if that occurs during a trial. Defendants like Swenson have to show prejudice. But that does not occur if the lawyers can use the materials effectively at trial, and that was the case here. In fact, the objective evidence establishes she wasn't prejudiced. She already had her own report that she had made to Montgomery County about the unrelated fraud. She had the 302s that had been tendered a long time ago. Moreover, she owned the adoption agency and therefore had access, control, ownership of all the communications, including with the birth mother and with the prospective parents. She also had plenty of time to use this information, especially when you compare it to this Court's precedents. And even if you look at the motion to dismiss hearing, she's already doing that. She's complaining there are various inconsistencies and we're still pre-trial. Moreover, it's important to remember Brady doesn't apply to information that Swenson already had or with reasonable diligence could have obtained. Brady doesn't also impose a duty to investigate. Moreover, here what the district court did is he inserted himself into the government's investigation and Swenson capitalized on it. The record is replete that the government — excuse me, that Judge Hughes was very, very upset or, you know, whatever you want to call it, with this investigation. One of the concerns that the defense counsel expressed, as I understand it, was that the government was allowing the victimized families and witnesses to decide whether or not the evidence was relevant. Can you explain that? Can you repeat that a little louder, please? I'm sorry. The — as I understand it, the government basically — the prosecutor was telling these families and witnesses that were certainly victims to decide what was relevant and what was not, to send us the things that are pertinent, instead of doing the examination themselves. That's the assertion. Can you comment on that? Yes. I think that's what the district court — that's the district court's interpretation. However, what the prosecutor did was go to the victims and get all of this, all of the information, all of the e-mails. In March of 2015, I believe it was — actually, March of 2016, she met with the AFPD and — and turned over all the 302s, Swenson's Yahoo account — and that's important to remember. Swenson had two accounts. In addition to the San Periel organization account, there was also the Yahoo account. And in March of 2016, the prosecutor turned that over. Also, all the e-mails provided by the prospective parents. And that — your question, Your Honor, goes back to what I said, that Swenson owned this particular adoption agency. So she had all these e-mails between herself and the prospective parents. Also, there's no — the — I mean, excuse me. What happened here is — and if you look at some of the pleadings, you'll see — is there was a disagreement about whether some of the things had been produced. The prosecutor produced many things in March of 2016. When the AFPD would complain, sometimes she would produce the same documents over again. In one of the pleadings, she even — excuse me, the AFPD even recognizes that. So to basically put certain information to bed, if you will, before trial, a search warrant was done for the proposed victims, the proposed victims' prospective parents' e-mails account. But the fact of the matter is, the AFPD accused the — accused the AUSA of certain misconduct, which just wasn't there. The misconduct — and that's not even the correct word — is that the AUSA completely forgot about the six reports. Also, she was getting ready for trial, and therefore, she was finding other documents, other witnesses. For those of you that have tried cases, you know that that's always a frantic time, trying to get ready, finding additional things, somebody saying, oh, I remember this, I remember that. And of course, one thing — one thing we also have to — And she — and she apologized in open court — Repeatedly. — for that — acknowledged that she had overlooked it. Repeatedly, Your Honor. She couldn't have apologized any more time, even when the judge was berating her — her constantly. One of the assertions is that on January the 27th, the government dumped — did a data dump, as we called it, on the defendant. Can you comment on that? Yes. The AUSA also believed that a lot of these documents had been produced at that time. And it's important to remember that shortly three weeks before trial, Swenson produced close to 9,000 documents herself. Unlike civil cases, where we often trade information way in advance and do depositions and what have you, it's not uncommon in criminal cases — We're not — we're not unfamiliar with criminal cases. Go ahead. No, but I'm — what I'm saying is, she also tendered 9,000 — almost 9,000 documents. But her motion to dismiss — My question was, please, was there a data — what is the comment with regard to your position with regard to the defendant's — the assertion that the defendant dumped — the government dumped these documents on January the 27th? As I said, the AUSA believed that many of these documents already had been produced — What did she do on January the 27th? She tendered many documents, some of which were a 16-page statement from a victim. How many documents — Various texts. How many documents did she tender? I'm not certain of that. I don't know if it's in the record, and if it is, I apologize for not knowing. But — Well, was there a data dump or not? Well, I — I think I would disagree, especially when we're saying she already had these documents to begin with, many of these documents. That's not to say that some new information wasn't produced. What we did learn is that there was a new witness that she — Let me go back to my question again. What, if anything, did the government produce on January the 27th? A 16-page statement from a victim, numerous texts from Swenson to a victim, emails from a victim to an unknown witness, and other documents. And again, the government's position was that — What are other documents? Well, if — A category or whatever. Well, the difficulty, Your Honor, in the appellate — I don't have those documents. They weren't — they're not part of the — I understand you don't have them here. I don't expect you to have them here. But this was an allegation that's made in the context of what the — the justification for what the district court did. They assert that on the Eva trial, you did a large doc — large numbers of documents. I didn't have no sense of what that means. Well, we could apply that same term to the 9,000 documents that the AFB — the AFPD produced. But again, she — So you produced 9,000? Pardon me? So you produced 9,000 documents? No, the AFP — Swenson produced that. But the fact of the matter is, the motion to dismiss was based on the six reports. And in order for her to — to succeed on the second Brady prong, she has to establish prejudice. And there is no prejudice if it's used effectively at — you know, during the trial. And this court's precedents are very, very clear that if there is enough time, then the prejudice prong can't be established. Well, there also could have been a continuance. Absolutely. And that goes — certainly goes to the remedy or to the sanction here. The four continuances were never — they weren't requested by the prosecution. Yes. And they were saying she needed more time to go through the evidence, it was a document-intensive case, and that she was waiting on documents from third parties. At no time was the government implicated in that. And also, Brady doesn't impose a duty to investigate upon the government. And here, as I said before, the district court inserted itself into the investigation and picked colorful words like incompetence and document dump or things like — I think that actually was the AFPD's term. But also, under 3500A, we don't even have to produce certain witnesses' statements until they're testifying. But, of course, we do as a matter of policy. I'm sorry? That could be during trial. Absolutely. As long as it's produced before the actual testimony. Absolutely. But we do it as a matter of cooperation and policy. But the other thing is, the evidence has to be material. And what that means is, Swenson's burden was to establish that there was a reasonable probability the result would have been different. It has to undermine confidence in the outcome, as the Supreme Court recently said in Turner, of the trial. The mere possibility that something might help or affect the outcome is not enough for materiality in the constitutional sense. Also, the court can't look at these documents in a vacuum. You have to look at it collectively. And that's why the importance of a trial is important. And here, regardless of whether you find a Brady violation, even though the government certainly maintains that did not occur, to dismiss this case with prejudice is a terrible, terrible sanction. Particularly when we're talking about a discovery violation. It was approximately 10 days after trial. The case is missing both of the things that are required for that. An extraordinary situation, and a situation where the defendant is prejudiced. As you pointed out, Your Honor, the AUSA immediately and repeatedly took responsibility for the late disclosure. She said she made a mistake. And again, it bears mentioning that while it was timely, Swenson had produced approximately 9,000 documents three weeks before trial. But the AUSA's mere oversight doesn't equate to gross negligence or intentional misconduct. And that weighs against a dismissal with prejudice. The error here was compounded because the district court never seriously considered the requisite factors. And the court also failed to impose the least severe sanction. It didn't analyze what counts in the indictment were allegedly impacted. Whether any could survive. The court didn't look at any type of sanctions, including a very short continuance. And as I said, during the motion to dismiss hearing, it was very clear that the AFBD was pretty up to speed already on these six reports. Which were disclosed on a Friday, and the hearing was on a Monday. And they say, well, the government didn't respond, but again, the timing was so short on this. Also, just going back to what we talked about earlier, what the record shows here is that the district court was intent on punishing the government. There's no question there. It became very personal, made all types of disparaging statements about her, about the late disclosure. And then rather than advancing justice, or considering elects extreme sanction. And of course, it's also important to remember here, the victims were punished. And these people had already been suffered both emotionally and physically. Based on the law and the facts, the district court misconstrued and misapplied Brady and exceeded its power. This court should remand to a different court, if possible, where a fair trial can be had. All right, thank you. Ms. Wilson, you said time for rebuttal. Mr. Sokolow? Thank you, Your Honor. May it please the court. Your Honors, the district court dismissed the indictment with prejudice. Finding that the integrity of the prosecution had been destroyed by the government's continuous and purposeful misconduct. The court's dismissal is fully supported by the evidence. And the government has not shown that the court's findings of fact or credibility choices are clearly erroneous. Or that the court abuses discretion. Well, in exercising his discretion, Judge Hughes went a little bit further than that, didn't he? He criticized the prosecutor because she was female. No, he didn't, Your Honor. Well, here's what he said. Here's what he said. And you can correct me if this is not in the record. He said, quote, It was a lot simpler when you guys wore dark suits, white shirts, and navy ties. We didn't let girls do it in the old days. Close quote. Is that in the record? It's in the record, but he didn't say it to the prosecutor. The government uses an ellipsis to make it seem like he said it to the prosecutor. Let's back up. Before we impugn the integrity of a federal district judge, let's do two things. Let's look at the context, and let's think about the court. So why don't you put that in the context? Because I have a hard time finding a context in which it would be appropriate for a federal district judge to say that it makes a difference whether an attorney is male or female. I'd be happy to. First of all, he wasn't talking to the attorney. Who was he talking to? He was talking to federal agents in the courtroom who are unidentified. You have to start at page 409. Were they lawyers? They were federal agents. You start at page 409, not page 412 where the government did. And when you start at page 409, the court asks about a report. And then the prosecutor turns to someone, and then the court says, Who are those gentlemen? This is on page 409. And when the court says, Who are those gentlemen? The prosecutor says, Oh, they're federal agents. Then we get three pages of discussion. And then the court asks about a report again. And then the case agent, not the prosecutor, the case agent, the district court says, It was a lot easier in those days when you guys wore suits and ties. Right? Because the federal ---- And we didn't let girls do it. Wait a minute. And he says, and then the case agent answers. Obviously, he wasn't talking to the prosecutor, nor could he be, because he would recognize the prosecutor. He wouldn't say it was easier to recognize you in the old days. And then the case agent answers, and he says, and in the old days we didn't let women do this. Well, anyone who knows Judge Hughes knows he's a historian. In fact, he's the historian of the Southern District of Alaska. Another word for that. What? Another word for that. Well, he's talking about the old days. Why do we think he's not talking about how unjust it was in the old days? Why do we think he's talking about why it's just now? We have the context where they have unidentified federal agents. We have the context where he's talking about reports. Why do we assume a federal judge is being unjust rather than talking about the old days when it was unjust? There's nothing there where he says anything derogatory. He's talking about unidentified federal agents in the courtroom and how in the old days it was easier to understand and to pick people out. They were gentlemen. They weren't women. He's referring to girls. I don't know who the other people were.  Well, the case agent who speaks up is a female. So, I mean, this is the problem with the government saying things on a cold record where we're supposed to interpret, we're supposed to think about what the prosecutor's face was, who Judge Hughes was looking at, whether he was smiling, whether he was frowning. We don't know. We can't just pick this out of a cold record. And that's the problem with what the government's doing with the rest of the case, too. Do you have any authority for a case being dismissed for an alleged pre-trial Brady violation rather than just being continued? Your Honor, I don't think I – the case that comes to my mind is the Ninth Circuit case of Chapman, but I think that case did go through trial. So, I don't, Your Honor. But here – Relatively unheard of. It is, except for the fact of the government's misconduct here. I mean, the government sat on – What about the fact that the defendant had been given four continuances? Right. The continuance is not the government's fault. The defendant wasn't incarcerated. The government – right. There were continuances, and the government had four years to get the information to the defense. The other thing I think the court doesn't realize is you need to look at the emails that the government produced. The government can't get up here and say Ms. Swenson had all the information when that's not even in the record. What is in the record is that the Sons Per El account was lost because the government allowed cedeless prosecutorial authority to the witnesses and allowed them to pick out whatever they wanted to pick out. And when you look through the emails – And, Your Honor, the emails, the document dump you were referring to, that is in the record. It's Defendants Exhibit 1 through 3. And I encourage you to look through those emails because when you look through those emails, you will see that – and this is the bottom line of the case – you can't put Humpty Dumpty back together again. Those emails are copied over and over. Some emails are on a page alone. Then there's the same email with other emails on the same page. The Stephan emails – I mean, the government doesn't even talk about the emails. The Stephan emails show that responses and other emails with them are missing. It says right on the page, quoted text hidden, which as I understand it means the related emails are gone. And when the court asked about that, what does quoted text hidden mean, the government didn't even respond. You know, the defense counsel said, I want to know what quoted text hidden means. The court said, I want to know what quoted text hidden means. The government didn't even respond. They didn't say anything. So those are the Stephan emails with quoted text hidden, all those emails missing that are related. Then we go on to the Reiser emails. The Reiser emails has a letter in them for Ms. Reiser, which in her letter she says they're repetitive and hard to follow. They're copied over and over. And they have emails in a different form. Some of the same emails later are in different font. They're all mixed up. I encourage you to look at the emails. This is a case, by the way, where the government is saying that Ms. Swenson didn't respond to the people, that she misled the people, that her contacts were deceptive. So the government lets Stephan pick out her own emails with quoted text hidden so we don't know what the emails are around them. She lets Reiser pick out her own emails where the accompanying emails are all mixed up and sometimes appear in one font and sometimes appear in another. We have the Nedrick emails where they actually say on them, quote, you move this message to a different location or to this location, showing that the emails have been moved. And the basic flaw is that there's no way for Ms. Swenson to recover those emails. The government gave the judges bogus excuse of, oh, it was a .org account. So we had no way to subpoena it before it was destroyed by the company. Well, we all know that all you need to do is look at the header on emails and you see where they came from. You see the domain name. I mean, holy moly, don't tell terrorists that all they need to use is a .org account and then the FBI can't find it. We know that's not true. So, I mean, this is, it starts there. And so you start with the fact that the emails are mixed up, are missing information, are in different fonts, have been moved, where Ms. Swenson is supposed to defend herself that she did respond. And then you go on to the government's misconduct. Of course, what you're saying, they're all good grounds for a motion to suppress, a motion to never get these exhibits into evidence. But that was shortcut by the fact that the case was dismissed rather than continued. And then you go to trial and then you file your objection and then the judge rules if it's not relevant or it's overly prejudicial. But nobody had that opportunity because he threw the case out with prejudice. Well, you could file a motion to do that or you could file a motion to dismiss given the government's repeated misconduct. They repeat a false, they produce. Do you have any authority for that where a judge would dismiss a case for prosecutorial what you call misconduct before trial? Yeah. I mean, if the defendant can't. Do you have a case that says that? I don't have a case, but we do have Brecht and we do have Cupid where it says that when the integrity of the prosecution is destroyed when the trial cannot be a reliable forum for the determination of guilt and innocence. The trial. The trial. That was the trial statement. Right. You can't have a trial because it's no longer a reliable forum for guilt or innocence. It's not what the founders wanted. It's not an inquisitorial prosecution like this one became. And don't forget the government's misconduct. They produced an FBI 302 that was false by omission. It left out all of the contacts in September and October of 2013 that were in Ms. Stephan's statement. And they didn't produce Ms. Stephan's statement. They just produced the FBI 302 that leaves out what's in her statement. Then it fails to turn over police reports that they had since 2013. And the agent's message on those once they're caught says, oh, well, you know about these. Should we even turn over the other ones? Then they told the court in open court that this case had nothing to do with phone records. When the indictment mentions phone calls, they told the court at least three times they were abiding by their discovery obligation when they had those reports for three years and hadn't turned them over. Weren't the phone calls in reference to the allegation that your client never called these people back, that they tried to call her numerous times? Wasn't that the reference to the phone calls? Yes. Yeah. And that's the whole case is about contact. Or lack of. Or lack of. So to say that phone records have nothing to do with this is just wrong. I mean, at least you'd expect the prosecutor to say, yes, Your Honor, the indictment talks about not calling back. But they said, oh, that has nothing to do with this case. They repeatedly violated the court's discovery deadline. They told the court that, as I said, the sansperl.org couldn't be subpoenaed. And the evidence was exculpatory that they suppressed. The Steffens statement shows numerous contacts with Ms. Swenson and the birth mother. The Reiser e-mail shows numerous contacts or that Ms. Reiser had contacts with Brandy, the birth mother. The e-mails show that Ms. Niedrich made excuses about paying her fees, which was a defense that she was cut off because she couldn't pay her fees. Was this information not in the possession also of the defense or reasonably available to the defense? Well, this. I mean, that's part of the test under Brady. Right. The statement, I mean, we didn't have that information. What I'm talking about is Exhibits 1 through 3 where the Duck government produced that folder. And I think it was from Reiser or I think Reiser. It says information from Reiser, Niedrich, Steffen given to the government in, I forget when it was, November of 2014 or 2013. So that was all information that was given to the government that the defense didn't have. They may have had some of those e-mails. I don't know. But they didn't have the statement. And by the way, when we ask about that, that's a good question. Because the government has the burden to show that the court's findings were clearly erroneous. What in the government's brief says, oh, no, look at this e-mail, look at this e-mail, look at this e-mail. They had it. Or it doesn't say that. Or it doesn't say. The government's brief and its argument doesn't even deal with the e-mails. They don't even talk about hidden quote, hidden text omitted. They don't even talk about the mixed up e-mails. So, I mean, all they say is they wanted to come in here and say, well, this is about Rule 16, and we failed to produce one or two reports, and so the judge wasn't, you know, this wasn't right. Wrong. This is about the government allowing witnesses to pick their own evidence. It's about not producing discovery over and over and over. And it's about, don't forget, the judge seeing that the government was never going to do that, was never going to abide by its Brady obligation because in the motion to dismiss hearing, don't forget, after all this has gone on, the agent is standing there with a file that has not yet been produced because it was too big, and they're going to produce it to the defense. And the judge says, have you reviewed, asked the prosecutor, have you reviewed the police report in that file, meaning have you abided by your Brady obligation? And what does the prosecutor say? Oh, no, your honor. I have my own theory of the case, and I'm doing my own investigation. And the judge responds, what else is it that you haven't reviewed or you think you don't need to review? After all of this, after a prosecutor understood her obligations, this prosecutor didn't even look at the report to see if there was Brady violations. So in the end, after all this misconduct, after evidence that has prohibited Ms. Swenson from defending herself, after all of this, the prosecutor is in essence saying, I don't need to do that. We don't need to abide by that obligation. I know how to try the case, judge. I know what I'm doing. I don't need to look at any police report. Your honors, the government has not met its high burden. The government is coming in here saying all kinds of statements that, like Ms. Swenson had this information. There's nothing in the brief that shows that. There's nothing in the record that shows that. And we know that the Sonscorrell account was destroyed because the government even admitted that. Here, the district court's findings are supported by the evidence, and the government has not met its high burden to show that the district court's factual findings are clearly erroneous. Your honors, this case should result in a two-sentence opinion. First sentence, the government has not met its burden to show that the district court's findings of fact are clearly erroneous or that the court abused its discretion. Second sentence, the judgment is affirmed. Thank you. Before you leave, I want to return to the quotation that I read to you earlier. I just want to be sure I understand. Is it the position of the federal public defender in Marjory Myers and Southern District of Texas that there was absolutely nothing inappropriate in Judge Hughes' comments, which included the comment, quote, we didn't let girls do it in the old days? Are you saying that there's absolutely nothing that should trouble us or that troubles you as the federal public defender about that comment in open court? My position, Your Honor? Well, you know, you represent Marjory Myers. No, I don't, Your Honor. I represent Ms. Swenson. I don't represent Marjory Myers. You tell me what the position is of the federal public defender in the Southern District of Texas on whether this is inappropriate coming from one of the judges in your locale. Our position, the office position, Ms. Swenson's position, is that you can't tell. You can't tell because you weren't there. You didn't see the expression on his face. You didn't see who he was looking at. You don't know if he was referring to history. That's why we have district court judges. And so to pick out the government's interpretation without being there on a cold record is just something we can't do. Do you think it matters if he said that to the female prosecutor or to the female agent? You seem to be trying to allege that he was speaking to the female agent, not the prosecutor. Do you think that's all right? I don't know who he was speaking to, Your Honor. Either one. Your Honor, I don't know what he was doing. I wasn't there. He said, we didn't do this in the old days. They didn't let women do this in the old days. I don't know if that was a historical statement. I don't know if that was men's derogatory. He said, we didn't let girls do it in the old days. That's a disparaging comment. That's as bad as a disparaging racial comment to refer to females or women as girls. That I agree with, Your Honor. And I didn't – that I agree with. I'm not disputing that. I'm talking about the context of it, Your Honor. I don't disagree with you on that. But I also think the court needs to look at the ellipsis that the government used to say that he was talking to the prosecutor. Well, we can certainly look at those, what, three or four pages to get together, and we will certainly do that. But I just find it hard to believe that you and your office aren't willing to stand here and tell us that we should be troubled by the way the judge made a careful distinction between men and women, whether they're investigators or prosecutors. I'm not defending Judge Hughes, Your Honor, and I'm not saying what he said was right. I'm saying we're not – we weren't there. I agree with you that the word girls is derogatory. The court reporter was there, and there's a transcript. So it doesn't matter whether you were there or not. It doesn't matter. Well, I think the court talks about the cold record all the time. I agree with the judge that girls is derogatory. All right, thank you, Mr. Toclo. Ms. Wilson, you say time for rebuttal. May it please the Court. Swenson's strategy all along is to try this case before this Court and have it weigh the evidence. Well, but we do have to impose, as Mr. Sokolow says, the clearly erroneous standard on the findings that are made. That's part of what we do. I agree with that, but I'm talking about going into the weeds, if you will, with the documents. Whereas that belongs to the province of the jury, whether something is inconsistent or what have you. And you really can't make that determination without the witnesses testifying at trial. Judge Clement, you asked about cases where courts have dismissed cases without prejudice. And on pages – You mean with prejudice? I'm sorry, with prejudice. On pages 46 and 47 of the government's brief, we talk about how the 11th Circuit relied on this court's opinion in McKinney and O'Keeffe about refusing to find a Brady violation where a defendant was never convicted and didn't suffer the effects of an unfair trial. And I also cited the 9th Circuit opinion where it talks about other circuits who have employed that same type of analysis. But in relation to what Judge Higginbotham asked earlier, just a very, very short synopsis of what occurred in the trial can be found on pages 491 and 492 of the record, which actually are contained in the excerpts, in the record excerpts that I filed. And that talks about what happened in this March 3, 2016 conference with the AFPD and then what emails were produced around January 23. Also, it's important to note that while, yes, there are exhibits that were tendered by both sides that are contained in this record, not all discovery is filed in the Southern District of Texas. And both sides admit there are thousands of documents. So there's a lot of information this court doesn't have access to, I don't have access to, in making all these evaluations. And again, I think it's important to stress that Swenson herself, as the owner of Sands Periel, had access to all of the emails and texts and things of that nature that transpired between her and the birth mothers. But Mr. Sokoloff says that the defense didn't have access to the interview that he was reading from? Again, I can't say that that's 100% accurate because I don't have the universe of documents. And as one of the things the AFPD filed said, they thought these documents were new, whereas the AUSA had represented that she had already produced them. And I think this, he said, or actually in this case she said, she said, highlights the reason why you go to trial in these situations, is that you can ferret all this stuff out. Is it favorable? Is it material? Is it whatever the third prong is? So you can make those types of evaluations. Even a short continuance here would be helpful. Because what you have to remember is that document dump that you talked about, Judge Higginbotham, in relation to their fifth motion for continuance, that motion was withdrawn. They wanted to go to trial. And the motion to dismiss was about the six reports. So once all this discovery was tendered, and they were complaining and filed the fifth motion for continuance, they then said, that's okay, we're going to go to trial. The motion to dismiss is about the six reports, as I discussed earlier. And with that, we request that you reverse the district court. All right. Thank you, Ms. Wilson. Your case is under submission.